**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**DANYALE GILL**,

Plaintiff,

v.

**MARK MCGLAUGLIN**, **ARTHUR WALGREN**, **BRIAN GROSE**, **MICHAEL KEMP**, **LARRY O'DEA**, **MICHAEL LELOFF**, **DUANE SMILEY**, **KENNETH McGAIR** as **THE PERSONAL REPRESENTATIVE OF THE ESTATE OF CHARLES MOOSE**, and **CITY OF PORTLAND**,

Defendants.

Case No. 3:25-cv-868-SI

**OPINION AND ORDER**

Megan Pierce, Justin Hill, and Jon Loevy, LOEVY + LOEVY, 311 N. Aberdeen Street, Third Floor, Chicago, IL 60607. Of Attorneys for Plaintiff.

Michael K. Porter and Caroline Turco, Senior Deputy City Attorneys, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Suite 430, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff, Danyale Gill, brought this case on May 21, 2025, ECF 1, and filed his First Amended Complaint ("FAC") on September 25, 2025, ECF 43. Among the Defendants named in the FAC are the City of Portland (the "City"), Mark McGlaughlin, Arthur Walgren, Brian Grose,

Michael Kemp, Larry O'Dea, Michael Leloff, and Duane Smiley (collectively, the "City Defendants").

In the FAC, Plaintiff also sued Maite Uranga, as the Personal Representative of the Estate of Charles Moose. After filing the FAC, Plaintiff moved to substitute in Kenneth McGair for Maite Uranga, alleging that Mr. McGair is the Successor Personal Representative for the Estate of Charles Moose. ECF 65. The Court granted that motion without objection. ECF 66. Plaintiff refers to all Defendants except the City as the "Individual Defendants." [1]

In his FAC, Plaintiff asserts four federal claims and three state law claims. Plaintiff's federal claims, all brought under 42 U.S.C. § 1983, allege: (1) a violation of Plaintiff's due process rights under the Fourteenth Amendment (Count I); (2) unlawful detention and prosecution in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments (Count II); (3) conspiracy to violate Plaintiff's constitutional rights (Count III); and (4) failure to intervene to prevent a violation of Plaintiff's constitutional rights (Count IV). Plaintiff brings his first two federal claims against all Defendants and the latter two federal claims only against the Individual Defendants. Against all Defendants, Plaintiff's state claims allege malicious prosecution (Count V), intentional infliction of emotional distress ("IIED") (Count VI), and civil conspiracy (Count VII).

Now before the Court are two motions to dismiss for failure to state a claim. The first motion was brought by the City Defendants against the original Complaint. ECF 36 ("First Motion"). The parties have agreed that the Court should consider the First Motion to be fully applicable against the FAC. ECF 41 at 2-3. The second motion was brought only by Defendant

[1] In both the original Complaint and the FAC Plaintiff also named as a Defendant "Sandra Moose as Successor in Interest to the Estate of Charles Moose." The parties have since agreed to the dismissal of all claims against Ms. Moose.

Kenneth McGair as Personal Representative of the Estate of Charles Moose (the "Estate"), ECF 67 ("Second Motion"). In the Second Motion, the Estate joins the City Defendant's motion to dismiss (*i.e.*, the First Motion) and asserts several additional arguments, some of which were specific to the Estate. The City Defendants then filed a notice of joinder, stating that they join in and incorporate all arguments made by the Estate in the Second Motion. ECF 69 at 2.

## STANDARDS

### A. Motions to Dismiss for Failure to State a Claim

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the

expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

**B. Judicial Notice and Incorporation by Reference**

Courts generally may not consider material outside of the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). A court, however, may consider documents outside of and not attached to the complaint when the document is either: (1) one "which a court may take judicial notice" of under Rule 201 of the Federal Rules of Evidence; or (2) is "incorporated into the complaint by reference." *La. Mun. Police Emps.' Retirement Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

Under Rule 201, a court may take judicial notice of adjudicative facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (quoting Fed. R. Evid. 201(b)(2)). "[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Khoja*, 899 F.3d at 999 (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruling on other grounds recognized in Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002)). Although a court may take judicial notice of the existence of state court documents,

it may not "take judicial notice of facts presented in those documents or in court opinions for the purpose of considering those facts to be established in the case currently before them." *Dauven v. U.S. Bancorp*, 390 F. Supp. 3d 1262, 1269 (D. Or. 2019) (citing *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003)); *see also Lee*, 250 F.3d at 690 (stating that when a court takes judicial notice of "another court's opinion," it does so "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity" (quotation marks omitted)).

Incorporation-by-reference, on the other hand, is "a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those documents that weaken—or doom—their claims." *Id.* A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908; *see also Khoja*, 899 F.3d at 1002-03. Unlike judicial notice, a court may generally "assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)," *Khoja*, 899 F.3d at 1003 (cleaned up) (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)), except when "such assumptions only serve to dispute facts stated in a well-pleaded complaint," *id.*

A document is central to or forms the basis of a complaint if the complaint "necessarily relies" on it. *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013) (quoting *Daniels-Hall*, 629 F.3d at 998). "A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448. A document satisfies this type of incorporation-by-reference if "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to

its motion to dismiss, and the parties do not dispute the authenticity of the document." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

**BACKGROUND**

At approximately 8:00 pm on March 25, 1994, an altercation occurred among a group of about twelve people in northeast Portland, gathered at the corner of Alberta Street and Northeast 15th Avenue. FAC ¶¶ 18-19. The altercation escalated, and a then-unidentified individual shot Tommy Felix in his forearm. *Id.* ¶¶ 20-21.

Several Portland Police Bureau ("PPB") officers were in the area at the time, including then-Chief of Police Charles Moose, now deceased. Chief Moose was driving an unmarked police vehicle, and PPB Officers Mark McLaughlin and Arthur Walgren were in a marked police car. *Id.* ¶¶ 23, 25. Chief Moose reported that he had witnessed the altercation, although he did not see the face of the shooter. Chief Moose pursued the suspected shooter until that individual went over a fence. *Id.* ¶¶ 23-24, 26, 38. Officers McLaughlin and Walgren followed the suspect. *Id.* ¶ 25. PPB officers then searched the neighborhood for the shooter, and ultimately came upon Plaintiff, when he was talking with two other people in front of a house on Northeast 16th Avenue. Plaintiff states that he had been visiting his uncle earlier that evening. *Id.* ¶¶ 27-28.

Plaintiff alleges that Chief Moose and Officer McLaughlin, with their guns drawn, "rushed at Plaintiff and the two other individuals," shouting at them "to freeze." *Id.* ¶ 29. Instead, Plaintiff and the two other individuals fled. *Id.* ¶ 30. Chief Moose and Officer McGlaughlin called for assistance and PPB Officer Michael Kemp soon arrived with a police dog. *Id.* ¶¶ 31-32. Several officers searched the neighborhood, finding a discarded brown, gray, and white plaid shirt in the backyard of a home on Northeast 15th Avenue. *Id.* ¶¶ 33-34. In an abandoned house on the other side of the street, officers also found Plaintiff, wearing a white T-shirt, gray sweatpants, and white Nike shoes. *Id.* ¶¶ 35-36. Plaintiff was unarmed, and the officers did not

find any gun in later searches of the neighborhood. *Id.* ¶¶ 42-43. Forensic testing later concluded that a .22 caliber pistol was used in the shooting. *Id.* ¶ 74.

After detaining Plaintiff, Chief Moose identified Plaintiff as the shooter, even though Chief Moose did not see the shooter's face. *Id.* ¶¶ 37-38. Officers McGlaughlin, Walgren, and Kemp allegedly told Plaintiff that they "knew" that he was not involved in the shooting. *Id.* ¶¶ 39-40. Nonetheless, the officers arrested Plaintiff, based on Chief Moose's identification. *Id.*

Meanwhile, PPB Detective Duane Smiley questioned Tommy Felix, the victim of the shooting, at the hospital. *Id.* ¶ 45. Detective Smiley elicited a description of the shooter that allegedly did not match Plaintiff's appearance or Chief Moose's description. *Id.* Felix allegedly said that the shooter was wearing a red shirt, black coat, and black pants. *Id.* PPB Officers Larry O'Dea and Michael Leloff showed Felix a photo array and Felix allegedly identified an individual other than Plaintiff, whom Felix said looked like the shooter. *Id.* ¶ 46. Plaintiff alleges that this information was withheld from Plaintiff, his attorneys, and the prosecutors. *Id.* ¶ 47.

At the police station, PPB Officer Brian Grose questioned Plaintiff. *Id.* ¶ 49. Plaintiff told Officer Grose that Plaintiff had been walking home after visiting his uncle when the police approached him; Plaintiff added that he was not involved in the shooting. *Id.* ¶ 51. Plaintiff alleges that, despite knowing the results of the photo array, Officer Grose falsely told Plaintiff that he had been identified in the photo array as the shooter. *Id.* ¶ 50.

During and after the interrogation, several Defendants allegedly prepared false reports that implicated Plaintiff in the shooting. Officer Grose allegedly created a report of the interrogation that "contained statements Plaintiff never made, misrepresented his statements, and omitted important exculpatory statements," including an inaccurate suggestion that Plaintiff was a member of a gang. *Id.* ¶ 53. Officer Walgren also allegedly drafted a report attributing to

Plaintiff statements that he never made, including that Plaintiff told police that they could not have seen him fire shots because they did not get a good look at him, and that after arresting Plaintiff, he told police that he "didn't have anything to do with shooting somebody" before officers told him that they were investigating a shooting. *Id.* ¶¶ 54-57. Plaintiff, however, alleges that the police told him about the shooting immediately upon his arrest. *Id.* ¶ 57. Officer Kemp also allegedly "fabricated evidence that his police dog alerted to Plaintiff because Plaintiff had the unique smell of someone who had fled the police and was scared of being caught." *Id.* ¶ 65.

Plaintiff also alleges that Defendants failed to perform normal investigatory steps. For example, despite Plaintiff's assertions that he had been visiting his uncle, Defendants allegedly did not contact Plaintiff's uncle to confirm Plaintiff's story. *Id.* ¶¶ 59-60. Additionally, despite Plaintiff's multiple requests for a gunshot residue test to confirm that he had not shot a gun that evening, Defendants never performed one. *Id.* ¶¶ 61-64.

On April 4, 1994, Plaintiff was charged with one count of attempted murder, one count of assault, and one count of unlawful use of a weapon. *Id.* ¶ 66. On July 18, 1994, Plaintiff was convicted by a nonunanimous jury on all three counts. *Id.* ¶ 67. He was sentenced to 40 months imprisonment. *Id.* ¶ 68.

In 2007, Gabriel Chiles admitted in a sworn statement to shooting Felix and further stated that Plaintiff was not involved in the shooting. *Id.* ¶¶ 70-71. A witness, McKeever Thompson, corroborated Chiles' story, stating that he saw Chiles fire a .22 caliber pistol at a rival gang member. *Id.* ¶¶ 72-73. In 2008, Plaintiff, representing himself, submitted affidavits from Chiles and Thompson in support of Plaintiff's motion for new trial, which was denied as untimely. *Id.* ¶ 75. In 2021, Plaintiff, again representing himself, filed a petition for post-conviction relief. *Id.* ¶ 76. He later obtained counsel, who filed an amended petition asserting "actual innocence." *Id.*

In July 2023, prosecutors agreed to vacate Plaintiff's conviction. *Id.* ¶ 77. Defendants state (ECF 67 at 14-15), and Plaintiff does not dispute, that the basis for vacatur was lack of jury unanimity under *Watkins v. Ackley*, 370 Or. 604 (2022). In *Watkins*, the Oregon Supreme Court held that the unanimous jury rule announced by the U.S. Supreme Court in *Ramos v. Louisiana*, 590 U.S. 83 (2020), applied retroactively in Oregon post-conviction proceedings. 370 Or. at 606-07, 632-34. In September 2023, nearly twenty years after Plaintiff's initial arrest, all charges against Plaintiff were dismissed. *Id.* ¶¶ 77-78.

## PARTIES' REQUESTS FOR JUDICIAL NOTICE

### A. City Defendants' Request

In the First Motion, Defendants ask the Court to consider two categories of documents:

> (1) Transcripts from hearings and the trial in the criminal proceedings underlying Plaintiff's causes of action, each of which is attached as an exhibit to the Declaration of Michael K. Porter; and
>
> (2) Police reports and other public records that Plaintiff expressly references, relies upon, or incorporates by implication in the Complaint.

ECF 36 at 22. Although Defendants frame their request as one for "judicial notice," Defendants' argument concerning the second category of documents is better read as arguing for consideration under the doctrine of incorporation-by-reference.

Regarding the first category of documents, Defendants offer the trial and hearing transcripts so the Court may consider and resolve *disputed* facts to be established in the current case. This is an inappropriate use of judicial notice. *See Khoja*, 899 F.3d at 999 (holding that a court may take judicial notice of public records, but "cannot take judicial notice of disputed facts contained in such public records"). Defendants' position also contravenes the motion to dismiss standard, which requires construing the facts in the light most favorable to the non-movant and

drawing all reasonable inferences in the non-movant's favor. *See Wilson*, 668 F.3d at 1140; *Newcal Indus.*, 513 F.3d at 1043 n.2. Plaintiff concedes, however, that certain *undisputed* facts may properly be gleaned from the hearing transcripts, such as the dates of the hearings and the courts in which they occurred, and this limited notice is consistent with Ninth Circuit case law. *See Khoja*, 899 F.3d at 999; *Lee*, 250 F.3d at 688; *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of the fact that certain arguments were made in a public filing). This limited form of judicial notice is appropriate for all the public filings attached to Defendants' First Motion.

As for the second category of documents, the Court agrees with Defendants that the police reports of Chief Moose, ECF 37, Ex. 1, and Officer Leloff, ECF 37, Ex. 10 ("Leloff Report"), which were attached to the First Motion and whose authenticity have not been disputed by Plaintiff, are appropriate for consideration under the doctrine of incorporation-by-reference because they are "integral" to Plaintiff's claims.[2] *See Ecological Rts. Found.*, 713 F.3d at 511. Critical to the FAC's central allegations of fabrication of evidence and suppression of exculpatory evidence is what Defendants did or did not include in their police reports. *See, e.g.*, FAC ¶ 41 ("[Chief] Moose and the other Defendant[ Officers] then fabricated false reports identifying Plaintiff as the individual who shot Felix."); *id.* ¶ 54 (alleging that Defendants wrote reports that contained statements that Plaintiff never made, misrepresented his statements, or omitted important exculpatory statements); *id.* ¶ 64 ("Defendants also failed to include in their reports that Plaintiff repeatedly requested a gunshot residue test."). Although the Court grants Defendants' request that it consider Chief Moose's and Officer Leloff's police reports in

---

[2] To the extent Defendants request that the hearing and trial transcripts be considered under the doctrine of incorporation-by-reference, this request is denied. Plaintiff's Complaint neither extensively references nor necessarily depends upon the contents of those documents.

evaluating the pending motions to dismiss, the Court will not assume the truth of the incorporated documents when doing so would "only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 450 F.3d at 1003.

**B. Estate's Request**

In the Second Motion, Defendants ask the Court to take judicial notice of nine documents, ECF 67 at 8-9, which are all records of a governmental entity. They are:

(1) The death certificate for Charles Moose.

(2) The Stipulated General Judgment entered July 17, 2023, in Malheur County Circuit Court Case No. 21CV14965.

(3) The Notice of Remand filed August 14, 2023, in Multnomah County Circuit Court Case No. 94-03-32092.

(4) The Tort Claim Notice submitted to the City of Portland on March 7, 2024, and received by the City on March 18, 2024.

(5) The True Bill returned by the 1994 grand jury in Multnomah County Circuit Court Case No. 94-03-32092.

(6) The June 9, 2022, order denying Plaintiff's unopposed motion to hold Post-Conviction Relief proceedings in abeyance pending the Oregon Supreme Court's decision in *Watkins v. Ackley*, in Malheur County Circuit Court Case No. 21CV14965.

(7) The General Judgment of Dismissal entered May 1, 2023, in Malheur County Circuit Court Case No. 21CV14965.

(8) The Motion to Hold Post-Conviction Proceedings in Abeyance filed June 8, 2022, in Malheur County Circuit Court Case No. 21CV14965, including the supporting declaration of counsel.

(9) The Register of Actions for Malheur County Circuit Court Case No. 21CV14965.

In their Reply in support of their Second Motion, Defendants clarify that they are only asking the Court to take judicial notice of the existence and filing date of each document. ECF 82 at 9. Plaintiff does not object to this limited notice. *See* ECF 77 at 8-9. Accordingly, the Court grants Defendants' request that the Court take judicial notice of the existence and filing dates of the nine documents attached to the Second Motion.

**C. Plaintiff's Request**

In his Response to the First Motion, Plaintiff asks the Court to take judicial notice of the dates of two documents. ECF 46 at 20. The first document is the tort claim notice directed to the City of Portland, dated March 7, 2024. ECF 46-3.[3] The second document is an email dated March 19, 2024, from the City of Portland, acknowledging receipt of the tort claim notice. ECF 46-4. Defendants did not object to Plaintiff's request. Accordingly, the Court grants Plaintiff's request that the Court take judicial notice of the dates of these two documents.

## DISCUSSION

**A. "Shotgun Pleading"**

Defendants argue that Counts I through IV of Plaintiff's FAC should be dismissed because they constitute "shotgun pleading," as recently discussed by the Ninth Circuit in *Gibson v. City of Portland*, 165 F.4th 1265 (9th Cir. 2026). Defendants assert that the FAC impermissibly bundles claims, makes conclusory allegations, and relies on group pleading. Regarding bundling, Defendants contend that Count I impermissibly bundles a due process fabrication-of-evidence theory with a *Monell* municipal liability theory, and Count II

[3] This document appears to be an "unfiled" version of the same tort claim notice for which the Estate requested judicial notice. ECF 68-4.

impermissibly bundles a false arrest claim with a malicious prosecution claim. The Court does not find that Counts I and II are inappropriately bundled. As for Count I, it is permissible to bundle together a *Monell* claim and the underlying constitutional violation on which it is based because these are not "disparate claims" like those that were pleaded in *Gibson*. *See id.* at 1291-92 (addressing a complaint that bundled together claims for retaliation for the exercise of speech and assembly, deprivation of fair judicial proceedings, deprivation of the right to travel, deprivation of equal protection, and deprivation of due process rights through defamation).

As for Count II, Defendants' argument is unpersuasive given: (1) Plaintiff's clarification that he is not pursuing a false arrest theory, but only a theory of unlawful prosecution and detention without probable cause under the Fourth Amendment, *see* ECF 77 at 13 n.3; and (2) this Court's decision, discussed below, dismissing Count II to the extent that it alleges "alternative" theories under the Fourteenth Amendment. The Court addresses below Defendants' arguments regarding conclusory allegations and group pleading in the context of specific claims.

**B. Oregon Tort Claims Act Pleading Requirements**

The parties agree that Plaintiff's state claims are governed by the Oregon Tort Claims Act ("OTCA"), which provides that "[n]o action arising from any act or omission of a public body" shall "be maintained unless notice of claim is given . . . within 180 days after the alleged loss or injury." Or. Rev. Stat. ("ORS") § 30.275. When a claim is subject to the notice requirement of the OTCA, a plaintiff *must* allege compliance with the law. *See Johnson v. Smith*, 24 Or. App. 621, 626 (1976) ("It is the allegation in the complaint that notice has been afforded the state pursuant to the requirements of the Act which confers jurisdiction on the court."); *see also Urb. Renewal Agency of City of Coos Bay v. Lackey*, 275 Or. 35, 40 (1976) ("The *pleading* and proof of notice sufficient to satisfy the requirements of ORS 30.275 [are] a mandatory requirement and a condition precedent to recovery under the Oregon Tort Claims Act." (emphasis added)).

Allegations of "substantial compliance" with the OTCA, however, are sufficient under Oregon law. *See Urb. Renewal Agency*, 275 Or. at 40-41.

Plaintiff's FAC does not allege compliance with the OTCA. With recognition that this facet of Oregon law is quite formalistic (particularly based upon the Defendants' own presentation to the Court of the Plaintiff's tort claim notice in its request for judicial notice, ECF 67 at 8), the Court nonetheless has a duty to evaluate jurisdiction. Therefore, all state claims must be dismissed on this ground. Although the Court is inclined to dismiss the claims without prejudice, prejudice is appropriate if leave to amend would be futile. *Reddy v. Litton Indus.*, 912 F.2d 291, 296-97 (9th Cir. 1990). The Court therefore addresses whether the claims are time-barred by the applicable statute of limitations or the OTCA's substantive notice requirement, or would be futile in some other respect raised by Defendants.

**C. Timeliness of Claims and Notice**

The parties do not dispute that Oregon's two-year statute of limitations for personal injury claims, ORS § 12.110(1), governs the length of the limitations period for Plaintiff's claims.[4] *See Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001) (explaining that "state law determines the length of the limitations period" for claims made under § 1983); *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738, 743 (9th Cir. 2019) (explaining that the relevant statute of limitations for § 1983 claims is the forum state's statute of limitations for personal injury actions). The parties also do not dispute that Plaintiff's state claims are subject to the OTCA's 180-day notice requirement. *See* ORS § 30.275. The parties disagree, however, as to when Plaintiff's claims

[4] Defendants argue that a separate, shorter statute of limitations applies to Plaintiff's claims against the Estate. The Court addresses this argument later in this Opinion and Order.

accrued for purposes of the statute of limitations and OTCA, and consequently whether Plaintiff timely filed his Complaint or provided timely notice.

**1. Plaintiff's Federal Claims Generally**

The accrual of a claim under § 1983 for statute of limitations purposes is governed by federal law. *Knox*, 260 F.3d at 1013. Although "[t]he general rule is that a civil rights claim accrues under federal law when the plaintiff knows or has reason to know of the injury which is the basis of the action," *Bonelli v. Grand Canyon University*, 28 F.4th 948, 952 (9th Cir. 2022) (quotation marks omitted), a different rule, known as the "*Heck* bar," applies when "'a judgment in favor of the plaintiff would necessarily imply' that [the plaintiff's] prior conviction or sentence was invalid." *McDonough v. Smith*, 588 U.S. 109, 119 (2019) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). In that case, "the statute of limitations begin[s] to run" "[o]nly once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated . . . ." *Id.* at 119-20.

Defendants argue that *McDonough* does not control Plaintiff's Fourth Amendment or other § 1983 claims and therefore does not defer the accrual of Plaintiff's claims. ECF 51 at 11. Defendants contend that Plaintiff's federal claims accrued no later than 2007-2008, when Plaintiff received evidence supporting his claim of innocence and filed his motion for new trial based on that evidence. This, according to Defendants, would make Plaintiff's federal claims untimely, or time barred.

Defendants, however, read *McDonough* too narrowly. In *McDonough*, the court emphasized that *Heck*'s "favorable-termination requirement . . . applies *whenever* 'a judgment in favor of the plaintiff would necessarily imply' that his prior conviction or sentence was invalid." *McDonough*, 588 U.S. at 119 (emphasis added) (quoting *Heck*, 512 U.S. at 487). Here, each of Plaintiff's federal claims—Fourteenth Amendment Due Process, Fourth and Fourteenth

Amendment malicious prosecution, conspiracy, and failure to intervene—all hinge on allegations that Defendants conspired to fabricate inculpatory evidence, suppress exculpatory evidence, and cause Plaintiff to be prosecuted without probable cause. The Court finds that each of the federal claims brought by Plaintiff "challeng[e] the validity" of Plaintiff's 1994 criminal conviction. *Heck,* 512 U.S. at 485. Plaintiff's conviction was not vacated until July 17, 2023, and all remaining criminal charges were dismissed on September 27, 2023. Plaintiff filed this action on May 21, 2025. Accordingly, Plaintiff's federal claims are timely.

Defendants also argue that Count II of Plaintiff's First Amended Complaint implicitly includes both a Fourth Amendment malicious prosecution theory and a Fourth amendment false arrest theory, and that the latter is untimely because that claim accrues as soon as Plaintiff was "detained pursuant to legal process"—in other words, when Plaintiff was arraigned and charged, which occurred no later than April 4, 1994. *Wallace v. Kato*, 549 U.S. 384, 389 (2007). Plaintiff clarifies, however, that in Count II, he "does not allege a Fourth Amendment claim about his arrest," and he "seeks damages for his wrongful prosecution and his wrongful detention beginning at the moment that legal process was initiated, not before." ECF 77 at 13 n.3. As recognized by the U.S. Supreme Court in *Heck*, a claim for malicious prosecution "permits damages for confinement imposed pursuant to legal process." 512 U.S. at 484. This is unlike a claim for false arrest, which only "cover[s] the time of detention up until issuance of process or arraignment, but not more." *Id.* (quoting W. KEETON, *ET AL.*, PROSSER AND KEETON ON LAW OF TORTS 888 (5th ed. 1984)). Defendants, however, have not argued that a claim for wrongful "post-process" detention would be untimely. The Court thus concludes that no dismissal is required on these grounds.

**2. Plaintiff's State Claims Generally**

Under Oregon law, the 180-day notice period under the OTCA and the two-year statute of limitations "should commence to run from the same date." *Adams v. Oregon State Police*, 289 Or. 233, 238 (1980). The Court next analyzes when Plaintiff's state claims accrued for the purposes of the statute of limitations and the OTCA's notice requirement.

Defendants argue that "Oregon law does not recognize '*Heck* tolling,'" ECF 51 at 11, and assert that under Oregon's "discovery" rule, Plaintiff's state claims accrued not later than 2007–2008. Plaintiff contends that "[t]he principles behind the *Heck* bar apply equally" to Plaintiff's state claims, ECF 46 at 18, and therefore argues that his claims did not accrue until the remaining charges against him were dismissed.

The Oregon Supreme Court has never expressly adopted or rejected the reasoning of *Heck* with respect to claims under Oregon state law. The Court therefore must ask how the Oregon Supreme Court likely would rule if faced with this question. *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (stating that without specific state supreme court guidance, a federal court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance").

In the only Oregon Court of Appeals case that discusses this aspect of *Heck*, *Underwood v. City of Portland*, 319 Or. App. 648 (2022), the Oregon Court of Appeals cited *Heck* in evaluating the potential of a state claim to undermine the plaintiff's underlying conviction. The *Underwood* court was asked to consider whether the trial court's grant of summary judgment to the defendant on the grounds that the plaintiff's state tort claims—which arose from an altercation with the defendant that ultimately led the plaintiff to be convicted for assault—constituted "an impermissible collateral attack on [the plaintiff's] criminal conviction." *Id.*

at 658. In that case, the Oregon Court of Appeals held that the plaintiff's claims did not "necessarily challenge the validity of his underlying convictions," which made *Heck* "inapposite." *Id.* The Oregon Supreme Court, as noted, has not stated a general rule like that articulated in *Heck*. It has, however, routinely recognized a "favorable termination" requirement for specific claims with the potential to undermine an underlying conviction. *See Alvarez v. Retail Credit Ass'n of Portland, Or.*, 234 Or. 255, 259 (1963) (concerning a claim of malicious prosecution); *Lane v. Bell*, 83 Or. 404, 425 (1917) (concerning a claim of false imprisonment); *Stevens v. Bispham*, 316 Or. 221, 239 (1993) (concerning a claim of legal malpractice allegedly committed by criminal defense attorney).

Considering these decisions from the Oregon Supreme Court and Oregon Court of Appeals, as well as the fact that many other state supreme courts have applied the *Heck* bar to state claims, *see, e.g.*, *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008); *Patterson v. Walker*, 429 P.3d 829, 832-33 (Ak. 2018); *Tinsley v. Town of Framingham*, 485 Mass. 760, 766-67 (2020); *Cooke v. Williams*, 349 Conn. 451, 461-65 (2024), the Court concludes that the Oregon Supreme Court likely would embrace *Heck*'s reasoning and defer accrual of state claims that necessarily undermine an underlying conviction. Thus, the accrual of Plaintiff's state claims was deferred because, like Plaintiff's federal claims, these claims rely on allegations that Defendants conspired to fabricate inculpatory evidence, suppress exculpatory evidence, and cause Plaintiff to be prosecuted without probable cause, meaning that any judgment in favor of the Plaintiff on these claims necessarily would undermine the validity of his conviction. *See Bliss v. Adewusi*, 2023 WL 6961979, at *8-9 (D. Or. Oct. 20, 2023) (holding that the accrual of a state IIED claim was deferred because the claim was "based on fabrication and withholding of evidence," making it "akin to a malicious prosecution claim").

The next issue is whether Plaintiff's claims accrued on July 17, 2023, when Plaintiff's conviction was vacated, or on September 27, 2023, when the criminal charges against Plaintiff were dismissed. Although Plaintiff's claims would be timely for statute of limitations purposes under either date, because Plaintiff's Tort Claim Notice was submitted to the City of Portland on March 7, 2024 (and received by the City on March 18, 2024), notice would be timely only under the OTCA's 180-day notice period if Plaintiff's state claims accrued upon dismissal rather than upon being vacated.[5]

In *McDonough*, the U.S. Supreme Court explained that *Heck* applies to bar not only claims that impugn existing convictions, but also those that undermine "ongoing prosecution[s]." 588 U.S. at 123. In the latter situation, a plaintiff's claim would not accrue until "favorable termination of [the plaintiff's] prosecution." *Id.* at 117; *see also id.* at 120 ("Only once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated within the meaning of *Heck*, will the statute of limitations begin to run." (citation omitted)).

The issue, therefore, is whether Plaintiff remained subject to an "ongoing prosecution" after his conviction was vacated on July 17, 2023. In its order vacating Plaintiff's convictions, the Malheur County Circuit Court ruled that "[a]ll of petitioner's convictions in Multnomah County Circuit Court No. 940332092, are vacated, and the criminal case is remanded to Multnomah County Circuit Court for further proceedings." Decl. of Michael Porter Ex. 3 (ECF 68-2 at 2). Defendants characterize the Multnomah County Circuit Court's dismissal order

[5] If Plaintiff's state claims accrued on July 17, 2023, the notice deadline under the OTCA would be January 13, 2024. If his state claims accrued on September 27, 2023, the notice deadline under the OTCA would be March 25, 2024.

on September 27, 2023, as "a ministerial act implementing the vacatur that was not disputed." ECF 67 at 15.

The Court disagrees. After the Circuit Court vacated Plaintiff's criminal conviction on the grounds that Plaintiff was convicted by a nonunanimous jury, the prosecution could have retried Plaintiff. *See* ECF 36 at 12 (explaining that after Plaintiff's 1994 conviction was vacated, "[t]he case was remanded for further proceedings to allow the Multnomah County District Attorney to consider whether to retry the matter"); *see also Martin v. State*, 331 Or. App. 225, 230 (2024) (holding that the post-conviction court was not required to "provide petitioner with the remedy of dismissal of the indictment" following the vacatur of a conviction under *Watkins*, and that the petitioner could be retried); *State v. Dinsmore*, 200 Or. App. 432, 438 (2005) ("[N]o reindictment of the charge was required because the charge continued to be pending by operation of law once the judgment of conviction for criminally negligent homicide had been overturned."). Thus, the prosecution against Plaintiff was still "pending" even after his conviction was vacated and remained pending until the Multnomah County Circuit Court' ordered dismissal of the indictment on September 27, 2023.

Under *McDonough*, therefore, Plaintiff's claims did not accrue until his remaining charges were dismissed on September 27, 2023, because he was still subject to an "ongoing prosecution" before that point. *See Dorotik v. County of San Diego*, 2024 WL 171389, at *3 (S.D. Cal. Jan. 16, 2024) (holding that the plaintiff's claims accrued when the charges against her were dismissed, not when her conviction was vacated); *Raugust v. Montana*, 2020 WL 3832971, at *4-5 (D. Mont. July 8, 2020) (same); *Edmonds v. City of Los Angeles*, 2023 WL7927797, at *13 (C.D. Cal. June 30, 2023) (same); *see also Bradford v. Scherschligt*, 803 F.3d 382, 388-89 (9th Cir. 2015) (holding that where the conviction has been vacated, but the plaintiff remains

"subject to the very same charges based on the same evidence" in a subsequent trial, the claim does not accrue until the plaintiff is acquitted of all charges). Accordingly, Plaintiff's state tort claims and notice were timely under the OTCA and the applicable statute of limitations.[6]

**3. Plaintiff's Claims Specifically Against the Estate**

Under federal and Oregon law, personal injury claims survive an alleged tortfeasor's death. *See* ORS § 30.080; *Byrd v. Guess*, 137 F.3d 1126, 1131 (9th Cir. 1998) ("It is undisputed that survival actions are permitted under § 1983 if authorized by the applicable state law.").

Under Oregon law:

> Claims for relief arising out of injury to or death of a person, caused by the wrongful act or negligence of another, shall not abate upon the death of the wrongdoer, and the injured person or the personal representatives of the one meeting death, as above stated, shall have a claim for relief against the personal representatives of the wrongdoer as if the wrongdoer had survived . . . .

ORS § 30.080. Oregon law also provides that

> If a person against whom an action may be brought dies before the expiration of the time limited for its commencement, an action may be commenced against the personal representative of the person after the expiration of that time, and within one year after the death of the person.

ORS § 12.190(2)(a).

---

[6] This Court's holding is not in conflict with the Ninth Circuit authority that Defendants have cited. As explained by the Ninth Circuit in *Bradford*, in *Rosales-Martinez v. Palmer*, 753 F.3d 890 (9th Cir. 2014), the plaintiff's claim only accrued for *Heck* purposes when his conviction was vacated because the vacatur was done "in conjunction with a comprehensive plea agreement that resolved all outstanding charges against the plaintiff," meaning that "[t]he date the conviction was vacated thus also marked the date on which the plaintiff could no longer be prosecuted for the underlying charges." 803 F.3d at 387 (citing *Rosales-Martinez*, 753 F.3d at 893). Similarly, in *Roberts v. City of Fairbanks*, the plaintiffs' convictions were vacated on the same day the prosecutor dismissed all indictments, and the court stated that the *Heck* bar lifted when "all convictions . . . were vacated *and underlying indictments ordered dismissed*." 947 F.3d 1191, 1195, 1198 (9th Cir. 2020) (emphasis added).

The Estate construes ORS § 12.190(2)(a) to require: "(1) the action is filed within the applicable statute-of limitations period, (2) the action is filed not more than one year from the decedent's death, and (3) the personal representative has notice of the action within one year from the decedent's death." ECF 67 at 11 (quoting *Singh v. Franke*, 2014 WL 1269477, at *3 (D. Or. Mar. 26, 2014)). The Estate then argues that, even if Plaintiff filed his claims within the standard two-year statute of limitations, they are untimely with respect to the Estate because they were not filed within one year of the death of Chief Moose.

The Court disagrees. In *Matter of Fox*, 352 Or. App. 789 (2026), the Oregon Court of Appeals recently explained:

> ORS 12.190(2)(a) does not say that, if a potential defendant dies before the SOL+60[7] period has expired, any action against the personal representative must be commenced within one year of their death. It says that, if a potential defendant dies before the SOL+60 period expires, an action against the personal representative may be commenced *after the SOL+60 period has expired* and within one year of their death. . . It has no effect or application . . . as to actions that are timely commenced before the expiration of the SOL+60 period.

*Id.* at 797 (emphasis in original). Therefore, Plaintiff's claims against the Estate are not untimely based on the argument that they were filed more than a year after Chief Moose died.[8]

The Estate also argues that Plaintiff's claims against the Estate are barred under the additional and independent basis that "letters of administration" were not issued to the personal

---

[7] The court in *Matter of Fox* explained that the phrase "before the expiration of the time limited for its commencement" as used in ORS § 12.190(2)(a) "does not refer to the period before the expiration of the statute of limitations itself but, instead, the period ending on the sixtieth day following the expiration of the statute of limitations." *Id.* at 795 (citing *Mitchell v. Harris*, 123 Or. App. 424 (1993)).

[8] The federal district court in *Singh*, whose reasoning was cited by Defendants, did not have the benefit of the Oregon Court of Appeals' guidance in *Matter of Fox* regarding the appropriate construction of ORS § 12.190.

representative, Ms. Uranga, until October 17, 2025, *see* ECF 92-7, which was after the statute of limitations expired on September 27, 2025. The Court rejects this argument, however, because Plaintiff filed his original Complaint naming as a Defendant "the Personal Representative of the Estate of Charles Moose" *before* the expiration of the limitations period; (2) Plaintiff filed a petition to appoint Ms. Uranga as personal representative (to which Ms. Uranga consented), ECF 92-4, *before* the expiration of the limitations period; and (3) Plaintiff filed a First Amended Complaint that specifically identified the personal representative as Ms. Uranga *before* the expiration of the limitations period. None of the authorities cited by Defendants suggest, under these circumstances, that claims against an estate should be found untimely merely because a probate court did not issue letters of administration until after the limitations period had expired.[9]

**D. Claims Based on the Alleged Falsity of Chief Moose's Identification of Plaintiff**

Defendants argue that any allegation that Chief Moose knowingly and falsely identified Plaintiff as the person who shot Tommy Felix is speculative because "Plaintiff does not identify

---

[9] In *Singh*, the plaintiff's original complaint was filed after the expiration of the statute of limitations period. 2017 WL 1269477, at *4. In *Worthington v. Estate of Davis*, 250 Or. App. 755 (2012) and *Wheeler v. Williams*, 136 Or. App. 1 (1995), the plaintiff's original complaint was filed within the limitations period, but the plaintiff failed to seek the appointment of a personal representative until *after* the period expired. *Worthington*, 250 Or. App. at 765 ("By the time plaintiff took steps to have a personal representative of [the decedent's] estate named so that she could sue that personal representative, the two-year limitations period for negligence already had expired."); *Wheeler*, 136 Or. App. at 5 (explaining that the plaintiff "did not seek the appointment of a personal representative until July 1993, beyond the statutory period"); *see also Singh*, 2017 WL 1269477, at *4. Additionally, in both *Worthington* and *Wheeler*, each plaintiff's original complaint named the *decedent* as the defendant, rather than the decedent's estate or the personal representative thereof. *Worthington*, 250 Or. App. at 757; *Wheeler*, 136 Or. App. at 5. In *Worthington*, the Oregon Court of Appeals emphasized that the reason the plaintiff's amended complaint could not relate back to the original complaint under Rule 23(c) of the Oregon Rules of Civil Procedure was that a decedent and the personal representative of the decedent's estate are distinct entities, meaning that the original complaint could not be said to have merely "misnamed" the appropriate defendant. 250 Or. App. at 759-66. The circumstances of these cases, therefore, are materially distinguishable from those present here.

any factual basis for the alleged falsity other than his own assertion that Chief Moose could not have seen the shooter's face." ECF 36 at 28. Defendants also assert that the FAC's allegation that Chief Moose "knew that his identification of Plaintiff as the shooter was false" is conclusory. ECF 67 at 27. Defendants contend, therefore, that any direct claims against the Estate, as well as any claims "derivative" of the allegation of false identification—including Plaintiff's conspiracy, fabrication-of-evidence, suppression of exculpatory-evidence, and IIED claims—should be dismissed.

The Court disagrees. The FAC includes additional allegations which, if taken as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must do at this stage of the litigation, plausibly establish that Chief Moose knowingly made a false identification of Plaintiff as the shooter. These include the allegations that Officers McLaughlin, Walgren, and Kemp told Plaintiff immediately after the identification that they knew the identification was false, FAC ¶ 39, that the victim provided a description of the shooter that did not match Chief Moose's description, *id.* ¶ 45, and that Chief Moose's identification was made after only a "cursory look" at Plaintiff, *id.* ¶ 37.

**E. Claims Against Officer Duane Smiley**

In his FAC, Plaintiff asserts only a few allegations against Officer Smiley, which do not plausibly state a claim against him. The FAC alleges that Officer Smiley "questioned Felix, the victim, at the hospital shortly after the shooting" and that "Felix provided a description of the shooter that did not match Plaintiff." *Id.* ¶ 45. The FAC then alleges generally that "Defendants" "brought Plaintiff to the police station" despite "kn[owing] that Felix had told them that someone other than Plaintiff had shot him." *Id.* ¶¶ 48-49. Even if Officer Smiley were one of the Defendants who brought Plaintiff to the police station, merely bringing a suspect to a police station after receiving an inconsistent eyewitness identification would not be enough to state a

claim against Officer Smiley. Without any allegations plausibly suggesting that Officer Smiley concealed or mischaracterized the description provided to him by Felix, was aware of the alleged fabrication and suppression of evidence allegedly committed by others, or knowingly participated in a joint effort falsely to inculpate Plaintiff, the FAC does not plausibly state a claim against Officer Smiley. The Court therefore dismisses all claims against Officer Smiley with leave to replead.

### F. Plaintiff's Due Process Claim (Count I)

Count I of the FAC alleges that Defendants violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when they "fabricated false evidence and suppressed and failed to preserve exculpatory evidence." Under Ninth Circuit law, deliberate fabrication of evidence, suppression of exculpatory evidence, and failure to preserve or gather potentially exculpatory evidence are separate theories of recovery, governed by different standards. The Court considers whether the FAC has adequately stated a due process claim under each standard.

#### 1. Deliberate Fabrication of Evidence

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc). The deliberate fabrication of evidence implicates "the fundamental due process right to a fair trial." *Richards v. County of San Bernadino*, 39 F.4th 562, 572 (9th Cir. 2022). This is true "regardless of the plaintiff's innocence or guilt . . . [as] the right to a fair trial is impinged either way." *Id.* at 573.

"To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the

plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). To satisfy the first element, the plaintiff "must first point to evidence he contends the government deliberately fabricated," and then show the alleged fabrication was deliberate. *See Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). To show that the fabrication was "deliberate," a plaintiff may offer direct or circumstantial evidence. *Caldwell v. City and County of San Francisco*, 889 F.3d 1105, 111 (9th Cir. 2018); *Ciria v. Gerrans*, 178 F.4th 491, 507 (9th Cir. 2026) ("The key is that the plaintiff must make some showing of 'dishonesty' through either direct or circumstantial evidence." (quoting *Devereaux*, 263 F.3d at 1076)). "Direct" evidence of deliberate fabrication of evidence can include, for example, direct misquotation of witnesses in investigative reports. *See Spencer*, 857 F.3d at 798-800; *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111-14 (9th Cir. 2010). In the absence of direct evidence, a plaintiff must point to "circumstantial" evidence that supports at least one of the following two propositions:

> (1) Defendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

*Devereaux*, 263 F.3d at 1076; *see also Costanich,* 627 F.3d at 1111 ("The *Devereaux* test envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence, or one who surreptitiously fabricates evidence by using coercive investigative methods. These are circumstantial methods of proving deliberate falsification.").

To establish the second element, causation, the plaintiff must show "that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the proximate cause or legal cause of the injury,

meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Spencer*, 857 F.3d at 798 (quotation marks omitted). Causation also can be shown under the "materiality causation standard," under which causation is established if the plaintiff "can show a reasonable likelihood that the allegedly fabricated . . . evidence could have affected the judgment of the jury." *Richards*, 39 F.4th at 573-74; *Caldwell*, 889 F.3d at 1115 (9th Cir. 2018) ("[A] § 1983 plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough.").

The FAC alleges facts showing direct and circumstantial evidence of deliberate fabrication as to Chief Moose and Officers McLaughlin, Walgren, Kemp, and Grose. The FAC alleges that Chief Moose knowingly made a false identification of Plaintiff as the person who shot Tommy Felix, that Officers Mclaughlin, Walgren, and Kemp told Plaintiff they knew Chief Moose's identification was false, and that Chief Moose and Officers McLaughlin, Walgren, and Kemp created reports falsely identifying Plaintiff as the shooter. FAC ¶¶ 39, 41. The FAC also alleges that Defendants Grose and Walgren created reports falsely containing statements that Plaintiff never made, misrepresented Plaintiff's statements, or omitted exculpatory statements. *Id.* ¶¶ 53-57. Further, the FAC alleges that Officer Kemp fabricated evidence that his police dog alerted to Plaintiff because Plaintiff had the unique smell of someone who had fled the police and was scared of being caught. *Id.* ¶ 65. Finally, the FAC alleges that Defendants "continued their investigation of Plaintiff despite the fact that they knew of—or were deliberately indifferent to—his innocence, and the results of the investigation were used to cause Plaintiff's prosecution and conviction." *Id.* ¶ 89.

These facts, if taken as true and drawing all reasonable inferences in Plaintiff's favor, plausibly support a claim for deliberate fabrication of evidence. Based on the nature of the

conduct alleged, there is a "reasonable likelihood" that this conduct may have affected the judgment of both the prosecutor in presenting the case to the grand jury and the grand jury in choosing to indict. The Court holds, therefore, that the FAC adequately states a claim for deliberate fabrication of evidence in violation of the Due Process Clause of the Fourteenth Amendment against McLaughlin, Walgren, Kemp, Grose, and the Estate.

As for Officers Leloff and O'Dea, however, the FAC alleges only that they suppressed or failed to preserve certain exculpatory evidence, not that they deliberately *fabricated* any evidence. In *Devereaux*, the Ninth Circuit explained that "a *Brady* violation cannot in itself support a deliberate-fabrication-of-evidence claim." 263 F.3d at 1079; *see also O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021) ("Deliberate fabrication . . . must mean something more than a mere omission."). Therefore, the Court dismisses with leave to replead Count II of the FAC to the extent it alleges a deliberate fabrication claim against Officers Leloff and O'Dea.

**2. Suppression of Evidence**

To state a due process claim under § 1983 for the unlawful suppression of exculpatory evidence (*i.e.*, a "civil *Brady* claim") against a police officer, a plaintiff must show that "(1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018) (quotation marks omitted). To satisfy the second element, the suppressed evidence must be "material," meaning that it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

The FAC alleges that Officers Leloff and O'Dea "destroyed and/or suppressed" evidence that Tommy Felix—the victim—was shown a photo array and identified an individual other than

Plaintiff as resembling the shooter. FAC ¶¶ 46-47. This includes destroying or suppressing "the photo of the individual that Felix had stated looked like the shooter." *Id.* ¶ 47. As a result, this evidence was "never provided to Plaintiff, his criminal defense attorneys, or the prosecutors." *Id.* The FAC further alleges that "[a]bsent this misconduct, [Plaintiff[] . . . would not have been convicted," and that the misconduct "was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence." *Id.* ¶¶ 90-91.

The Leloff Report, which the Court considers under the doctrine of incorporation-by-reference, documents Felix's non-identification of Plaintiff when shown the photo array, and states that Officer Leloff provided the photo array to Officer Grose. It can be reasonably inferred from the FAC's allegation that the array was not disclosed to Plaintiff, his counsel, or prosecutors, and that the array was subsequently "destroyed and/or suppressed" by Defendants. FAC ¶ 46. Even if the Leloff Report *discussing* the array was available to prosecutors, Plaintiff, and his counsel, the alleged destruction or suppression of the photos in the array still plausibly might have harmed Plaintiff. Thus, the Court finds that Plaintiff has sufficiently alleged that, had the photos not been suppressed, "Plaintiff's trial counsel could have used the photo that the victim identified as resembling the shooter to prove that someone else committed the shooting, and she could have further impeached [Chief] Moose's identification." ECF 46 at 32-33. Accordingly, the FAC adequately states a civil *Brady* claim against Officers Leloff and O'Dea. The Court dismisses with leave to replead Count I of the FAC to the extent it alleges a civil *Brady* claim against the other defendants.[10]

---

[10] The FAC alleges that Officer Grose suppressed exculpatory evidence by destroying interrogation notes that included exculpatory statements by Plaintiff. *See* FAC ¶ 52. Although this might support Plaintiff's malicious prosecution claim, it does not plausibly support a civil

### 3. Failure to Preserve or Gather Exculpatory Evidence

To state a claim under § 1983 alleging a violation of due process rights based on an unlawful failure to preserve or gather potentially exculpatory evidence, "the plaintiff must show: (1) the evidence was material; and (2) that the failure to collect the evidence was in bad faith." *Pressler v. Nev. Dep't of Pub. Safety*, 2019 WL 7340507, at *4 (D. Nev. Dec. 12, 2019) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Evidence is "material" if it "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). The "presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Sivilla,* 714 F.3d 1168, 1172 (9th Cir. 2013) (quotation marks omitted).

The FAC alleges that Officers Grose and O'Dea "refused to conduct a gunshot residue test of Plaintiff or his clothing, thereby failing to preserve important evidence of Plaintiff's innocence." FAC ¶ 63. The FAC also alleges that "[a]t the time, the City of Portland and Portland Police Bureau regularly used gunshot residue tests to determine whether a suspect's hands or clothing had traces of gunshot residue," and that "Defendants also failed to include in their reports that Plaintiff repeatedly requested a gunshot residue test." *Id.* ¶¶ 62, 64. A gunshot residue test has obvious exculpatory value. The Court finds, therefore, that the FAC adequately

---

*Brady* claim. Plaintiff must allege how not receiving evidence of his *own* statements caused him harm, when he could repeat those statements to his attorney, the prosecutor, or at trial. *See United States v. Fola*, 2015 WL 13322373, at *3 (D. Haw. Mar. 30, 2015) (finding no *Brady* claim where government destroyed notes of an interview in which the defendant made exculpatory statements because the defendant "himself was aware he made exculpatory statements").

states a failure-to-preserve claim against Officers Grose and O'Dea. The Court dismisses with leave to replead Count I of the FAC to the extent it alleges a failure-to-preserve claim against the other defendants.[11]

**G. Plaintiff's "Unlawful Detention and Prosecution" Claim (Counts II)**

**1. Fourth Amendment**

Defendants argue that the FAC does not adequately allege a Fourth Amendment malicious prosecution claim under § 1983 (also referred to as a claim for "unreasonable seizure pursuant to legal process," *Thompson v. Clark*, 596 U.S. 36, 42 (2022)).[12] In *Thompson*, the U.S. Supreme Court explained: "To determine the elements of a constitutional claim under § 1983, [a court must] first look to the elements of the most analogous tort as of 1871 when § 1983 was enacted, so long as doing so is consistent with 'the values and purposes of the constitutional right at issue.'" *Id.* at 43 (quoting *Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017)). The Supreme Court found that the most analogous tort to a Fourth Amendment malicious prosecution claim is a common law malicious prosecution claim. *Id.* The Supreme Court recited the elements of the tort of malicious prosecution, as of 1871, which were:

> (i) the suit or proceeding was instituted without any probable cause; (ii) the motive in instituting the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution terminated in the acquittal or discharge of the accused.

---

[11] The FAC also alleges that Defendants "never tried to contact Plaintiff's uncle" despite Plaintiff providing his uncle's contact information and telling the officers after his arrest that his uncle could provide Plaintiff an alibi. *See* FAC ¶¶ 59-60. This allegation may support a different claim, but these facts do not adequately show that Plaintiff "would be unable to obtain comparable evidence by other reasonably available means." *See Trombetta*, 467 U.S. at 489.

[12] The FAC titles Count II as "Unlawful Detention and Prosecution."

*Id.* (quotation marks omitted). The Supreme Court then analyzed only the third element, "favorable termination," both as to its requirements and whether it was consistent with the values and purposes of the Fourth Amendment. *Id.* at 44-49. In *Thompson*, the Court concluded that based on the common law from 1871, the favorable termination element "does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence" and that a lack of such a requirement is consistent with the values and purposes of the Fourth Amendment. *Id.* Here, Defendants contend that Plaintiff's claims should be dismissed because he has not adequately alleged lack of probable cause, malice, favorable termination, or causation. The Court discusses each in turn.

**a. Probable Cause**

Defendants argue that the grand jury's decision to indict Plaintiff for the shooting of Felix supports a prima facie finding of probable cause. Defendants concede, however, that this presumption can be overcome by proof the indictment was obtained by improper means. The FAC alleges that Defendants fabricated inculpatory evidence *and incorporated that evidence into official police reports*. *See, e.g.*, FAC ¶ 53-57. These allegations create a plausible inference that the grand jury's decision to indict was influenced by Defendants' alleged misconduct, overcoming the presumption.

**b. Malice**

The parties dispute whether Plaintiff must establish "malice" in addition to a lack of probable cause to bring a Fourth Amendment malicious prosecution claim under § 1983. This question was explicitly left open by the Supreme Court in *Thompson*. *See Thompson*, 596 U.S. at 44 n.3 ("We need not decide whether a plaintiff bringing a Fourth Amendment claim under § 1983 for malicious prosecution must establish malice (or some other *mens rea*) in addition to

the absence of probable cause."). In addition, the Ninth Circuit has yet to weigh in on this question.[13]

In discussing the elements of a Fourth Amendment malicious prosecution claim in *Thompson*, the Supreme Court explained that, at the time § 1983 was enacted, the consensus was that a common law malicious prosecution tort required showing that "the motive in instituting the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice." *Thompson*, 596 U.S. at 44 (quotation marks omitted). In deciding whether malice (or some other *mens rea* is needed), this Court considers the second part of the test stated in *Thompson*, namely, whether such a requirement is consistent with the values and purposes of the Fourth Amendment. The Court finds persuasive the many circuit court opinions, pre-*Thompson*, that determined that requiring a showing of malice or any other *mens rea* does not comport with the values and purposes of the Fourth Amendment. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 n.5 (4th Cir. 1996); *Sykes v. Anderson*, 625 F.3d 294, 309-10 (6th Cir. 2010); *see also Gallo v. City of Philadelphia*, 161 F.3d 217, 222 n.6 (3d Cir. 1998); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 99-101 (1st Cir. 2013); *but see Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023) (holding that even

[13] After *Thompson*, the Ninth Circuit has substantively addressed § 1983 malicious prosecution claims only in one published decision, *Ciria v. Gerrans*, 178 F.4th 491 (9th Cir. 2026), and no party has cited this case. In *Ciria*, the Ninth Circuit did not analyze or even mention *Thompson*. The Ninth Circuit in *Ciria* did not look to federal common law at the time of § 1983's enactment (1871) when analyzing the plaintiff's claim for federal malicious prosecution. Instead, it applied California law, stating that "to prevail on a § 1983 claim of malicious prosecution claim in California, a plaintiff 'must show that defendants prosecuted him with malice and without probable cause, and that they did so for the purpose of denying him equal protection or another specific constitutional right.'" 178 F.4th at 515 (cleaned up) (quoting *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004)). The Court finds that *Ciria* is inapplicable here because California law does not apply. For a more comprehensive discussion of the tension between *Ciria* and *Thompson*, *see Chirre v. City of Portland*, 2026 WL 3093501, at *2-4 (D. Or. Oct. 16, 2026).

after *Thompson*, the elements of the state tort of malicious prosecution remain "coextensive" with the elements of the constitutional tort of Fourth Amendment malicious prosecution, and therefore requiring that a § 1983 plaintiff allege and prove "malice" because it was required under Louisiana law).[14]

The Supreme Court has stated that "the Fourth Amendment regulates conduct rather than thoughts; and it promotes evenhanded, uniform enforcement of the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (citations omitted). The Supreme Court, therefore, has "almost uniformly rejected invitations to probe subjective intent" in Fourth Amendment cases. *Id.* at 737; *see, e.g.*, *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry."). Instead, a lack of probable cause has traditionally been sufficient to show a seizure is "unreasonable" for the purposes of the Fourth Amendment. *See, e.g.*, *Bailey v. United States*, 568 U.S. 186, 192 (2013) ("'[T]he general rule [is] that Fourth Amendment seizures are "reasonable" only if based on probable cause' to believe that the individual has committed a crime" (quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979)). Based on the Fourth Amendment's focus on "conduct rather than thoughts," *see Ashcroft*, 563 U.S. at 736, the Court concludes that Plaintiff need only show that Defendants acted without probable cause, not that they acted with malice or any other *mens rea*.

---

[14] Although the Supreme Court has not explicitly resolved the question that it left open in *Thompson*, the Supreme Court's only post-*Thompson* decision discussing the elements of a Fourth Amendment malicious prosecution claim omitted any reference to a requirement of malice or other *mens rea*. *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 558 (2024) ("To succeed on [a Fourth Amendment malicious prosecution claim under § 1983], a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person.").

**c. Favorable Termination**

Defendants argue that the dismissal of charges after vacatur predicated solely on a Sixth Amendment unanimity violation should not be deemed a favorable termination because it is a "procedural outcome" that does not "indicate [Plaintiff's] innocence." ECF 51 at 15. This argument is foreclosed by *Thompson*, in which the Supreme Court held that "a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." 596 U.S. at 49. Plaintiff has met that burden here by alleging that his conviction was vacated and his charges dismissed.

**d. Causation**

Defendants argue that the Multnomah County District Attorney's decision to present the case to the grand jury[15] breaks the chain of causation that links Defendants' alleged actions or omissions with Plaintiff's ultimate prosecution and detention. Defendants concede, however, that the chain of causation is not broken when a defendant played an active role in causing the prosecution to be brought, such as by improperly pressuring a prosecutor, knowingly providing misinformation, or concealing exculpatory evidence. *See Novak v. City of Parma*, 33 F.4th 296, 307 (6th Cir. 2022) (applying traditional tort causation principles to conclude that a prosecutor's independent charging decision will not break the causal chain for malicious prosecution purposes "when an officer could reasonably foresee that his misconduct . . . would result in an independent decision to prosecute the plaintiff" (cleaned up)).

---

[15] Defendants also argue that the grand jury's decision to indict Plaintiff breaks the chain of causation. This argument fails for the same reasons as Defendants' arguments regarding probable cause.

The FAC expressly alleges that Defendants (other than Officer Smiley) fabricated inculpatory evidence and incorporated that evidence into official police reports and suppressed exculpatory evidence from prosecutors. *See* FAC ¶¶ 6, 47, 52-58. These allegations are sufficient to create a plausible inference that the prosecutor's decision to present the case to a grand jury was influenced by Defendants' alleged misconduct or at least was a "reasonably foreseeable" result of such misconduct. *See Novak*, 33 F.4th at 307. Plaintiff, therefore, has alleged sufficient facts plausibly to state causation with respect to all Individual Defendants except Officer Smiley.

**2. Fourteenth Amendment**

Count II of Plaintiff's FAC refers to the Fourth and Fourteenth amendments as a basis for Plaintiff's malicious prosecution claim under § 1983, and Plaintiff has argued in his briefing that the Fourteenth Amendment's procedural due process clause provides an "alternative basis" for his claim. ECF 77 at 35. According to Plaintiff, the Supreme Court "has left open whether the Fourteenth Amendment provides an alternative basis for [a federal malicious prosecution claim]," and "[t]he Ninth Circuit similarly has not yet resolved whether the Fourth Amendment provides the exclusive path for . . . such a claim, or whether the Fourteenth Amendment's procedural due process clause provides an alternative path." *Id.* Plaintiff, however, has not explained how the elements of a federal malicious prosecution claim would be different under the Fourteenth rather than under the Fourth Amendment, nor has he alleged how his FAC would state a claim under such an "alternative path."

Plaintiff has failed to preserve this argument. *See Consumer Fin. Prot. Bureau v. Noh*, 2022 WL 20581960, at *2 (C.D. Cal. Jan. 18, 2022) (noting that a court is not "required to address perfunctory and undeveloped arguments" (quoting *Khademi v. S. Orange Cnty. Cmty. Coll. Dist.*, 194 F. Supp. 2d 1011, 1027 (C.D. Cal. 2002))); *cf. Ventress v. Japan Airlines*, 747 F.3d 716, 723 n.8 (9th Cir. 2014) (declining to address an "undeveloped argument . . . not

supported by citations to the record, argument, or any legal authority"); *Crime Just. & Am., Inc. v. Honea*, 876 F.3d 966, 978 (9th Cir. 2017) ("Issues raised in a brief which are not supported by argument are deemed abandoned." (quoting *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988))). Accordingly, the Court grants Plaintiff's motion to dismiss Count II of Plaintiff's FAC to the extent it alleges an "alternative theory" under the Fourteenth Amendment. This Court dismisses this claim with leave to replead.

**H. Plaintiff's Federal and State Conspiracy Claims (Counts III and VII)**

The Court dismisses with prejudice Plaintiff's state claim of conspiracy (Count VII of the FAC) because Oregon law does not consider "civil conspiracy" as a separate tort. The Oregon Supreme Court has expressly held that "conspiracy" is not a "separate theory of recovery. Rather, conspiracy to commit . . . a tort [is a] way[] in which a person may become jointly liable for another's tortious conduct." *Granewich v. Harding*, 329 Or. 47, 53 (1999) (citation omitted). Relying on *Granewich*, on several occasions, the Oregon Court of Appeals has unequivocally stated that "civil conspiracy is not, itself, a separate tort for which damages may be recovered." *See, e.g.*, *Morasch v. Hood*, 232 Or. App. 392, 402 (2009). For these reasons, Count VII of the FAC is not properly stated as a separate tort.

Regarding Plaintiff's federal conspiracy claim, Defendants argue that the FAC "contains no factual detail showing how certain defendants . . . joined any agreement." ECF 36 at 31. To allege a federal conspiracy claim, a plaintiff must show an agreement, or "meeting of the minds" between the alleged co-conspirators. *See, e.g.*, *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). An agreement "may be inferred from conduct and need not be proved by evidence of an express agreement." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983).

The FAC adequately pleads facts from which a jury could infer that Officers McLaughlin, Walgren, Kemp, Leloff, O'Dea, and Grose worked in concert with others

unlawfully to inculpate Plaintiff. *See, e.g.*, FAC ¶¶ 39-40 (alleging that Defendants McLaughlin, Walgren, and Kemp arrested Plaintiff after telling him "they knew he was not the shooter, but that the Chief had made a (false) identification of him"); *id.* ¶¶ 46-47 (alleging that Defendants Leloff and O'Dea "destroyed and/or suppressed" a photo array in which the victim had identified an individual other than Plaintiff as the potential shooter); *id.* ¶¶ 53-54 (alleging that Defendants, including Defendants Grose and Walgren, fabricated reports of their interactions with Plaintiff); *id.* ¶ 63 ("Defendants, including Defendants Grose and O'Dea, refused to conduct a gunshot residue test of Plaintiff or his clothing, thereby failing to preserve important evidence of Plaintiff's innocence.").

Regarding Chief Moose, however, the FAC alleges only that he documented his own false identification in a police report, despite knowing it was false. FAC ¶¶ 37, 41. The FAC alleges no facts plausibly suggesting that Chief Moose was aware of, let alone approved of or directed the conduct of the other officers. A conclusory allegation that Chief Moose "approved of and ratified [the other officers'] conduct," *id.* ¶ 93, is not enough, and the Court dismisses with leave to replead Plaintiff's federal conspiracy claim against the Estate.

## I. Plaintiff's Failure to Intervene Claim (Count IV)

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996). An officer, however, is only liable for failure to intercede if he had a reasonable opportunity to do so. *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000).

Defendants argue that Plaintiff's failure-to-intervene claim, Count IV, should be dismissed because it is "untethered from any underlying constitutional violation" and is impermissibly "attached to collective 'Defendants' engaged in unspecified conduct.'" ECF 67

at 27. The Court disagrees. The FAC adequately "tethers" the conspiracy claims to the FAC's underlying the alleged violations of the Fourth (malicious prosecution) and Fourteenth (due process) Amendments, which are based on the alleged fabrication of evidence and the alleged suppression of exculpatory evidence.[16]

Further, because the FAC adequately alleges that all Individual Defendants other than Chief Moose and Officer Smiley worked in concert with one another to deprive Plaintiff of his rights, the Court finds that the FAC adequately alleges that these Defendants had both an awareness that the other Defendants were violating Plaintiff's rights and an opportunity to intervene and yet failed to do so. As explained above, however, the Court does not find that the FAC has alleged facts from which a reasonable inference may be drawn that Chief Moose had an awareness of the unlawful conduct of the other Individual Defendants. Therefore, the FAC fails to state a claim against him for failure to intervene, and the Court dismisses the Estate from Count IV with leave to replead.

### J. Plaintiff's State Claim for Malicious Prosecution (Count V)

Count V of Plaintiff's FAC alleges malicious prosecution under Oregon state law. FAC ¶¶ 119-25. In the parties' Joint Status Report filed on June 12, 2026, however, Plaintiff stated that he is no longer pursuing his state claim of malicious prosecution and that he "is not alleging that [Individual Defendants] engaged in conduct that was malicious." ECF 75 at 1-2. Therefore, the Court dismisses Plaintiff's state claim for malicious prosecution.[17]

---

[16] Defendants make the same argument regarding Plaintiff's conspiracy claims. The Court similarly finds this argument without merit.

[17] Defendants argue that "[a]ll claims asserting malicious prosecution or claims derivative of a malicious prosecution" must be dismissed on the basis of Plaintiff's statement that he "is not alleging that [Individual Defendants] engaged in conduct that was malicious." ECF 82 at 23. The Estate identifies Plaintiff's IIED and conspiracy claims as such "derivative claims" because they are "premised on malicious prosecution specifically or malicious conduct generally." *Id.* In the

**K. Plaintiff's IIED Claim (Count VI)**

Defendants raise for the first time in their reply to the First Motion a new argument that the FAC fails to state an IIED claim under Oregon law.[18] ECF 51 at 12-13. For judicial efficiency, the Court will address this argument.

Under Oregon law, a plaintiff asserting a claim for IIED must prove: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995). To survive a motion to dismiss, it is sufficient that a plaintiff alleges either that the defendant "desired to inflict severe emotional distress [or] that the defendant knew that such distress was substantially certain to result from a volitional act." *Babick v. Or. Arena Corp.*, 333 Or. 401, 412 (2002). For the defendant's acts to constitute an extraordinary transgression, the conduct alleged must be "outrageous in the extreme." *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or. App. 234, 239 (1992).

Regarding the first element, Plaintiff's FAC alleges that "Defendants' conduct was undertaken with reckless disregard of the high probability that the conduct would cause severe emotional distress to Plaintiff." FAC ¶ 129. Under Oregon law, and given the nature of the accompanying conduct allegations, such an assertion is sufficient to allege intent. *See*

---

Joint Status Report, however, Plaintiff stated that he is "still pursuing all other claims in this case." ECF 75 at 2 (emphasis added). Although Plaintiff is no longer alleging "legal malice," none of Plaintiff's remaining claims require a showing of legal malice. To the extent that Plaintiff's allegations suggest conduct that could be construed to meet the legal or colloquial definition of "malice," these allegations are not foreclosed by Plaintiff's statement in the parties' stipulation.

[18] This argument was not made, at least in any non-cursory manner, in either the First Motion or the Second Motion.

*McGanty*, 321 Or. at 551 (holding that the plaintiff pleaded the requisite intent to establish a claim for IIED when the plaintiff alleged that the defendant's conduct "was intentional and voluntary" and they "knew or should have known" that their conduct would cause severe distress).

Regarding the second element, Defendants argue that the FAC alleges only harms that arose from Plaintiff's 1994 conviction, not any individual acts of any Defendant. The Court disagrees. First, the FAC alleges harms resulting from Plaintiff's post-process *detention*, which occurred before and after his conviction. *See* FAC ¶¶ 79-81. Second, it reasonably can be inferred from Plaintiff's allegations that Defendants' conduct led Plaintiff being placed on trial and, therefore, "caused" his conviction. Finally, the Court finds that "fabricating or suppressing evidence to obtain a criminal conviction is utterly intolerable in a civilized community," satisfying the third element. *McGuffin v. Daniels*, 790 F. Supp. 3d 1079, 1128 (D. Or. 2025), *rev'd in part on other grounds* 2026 WL 2655319 (9th Cir. Sep. 9, 2026). Thus, Plaintiff has plausibly pleaded enough to state claim for IIED under Oregon law for all Individual Defendants other than Officer Smiley. As discussed, however, Plaintiff failed to allege compliance with the OTCA's notice provision in his complaint. Therefore, this count is dismissed with leave to replead as to all defendants.

### L. Qualified Immunity (Federal Claims)

Defendants argue that, under the qualified immunity doctrine, all claims against Officers Smiley, Leloff, O'Dea, and Kemp should be dismissed. "The doctrine of qualified immunity protects government officials from liability for civil damages." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."

*Id.* "Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time the action was taken." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (cleaned up). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Qualified immunity, however, is only an immunity from suit for damages, it is not an immunity from suit for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

In *Saucier*, the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id.* The second step is to determine "whether the right was clearly established." *Id.* The constitutional issue, however, need not be addressed first in every case. *Pearson*, 555 U.S. at 236. Regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not clearly established or the officer could have reasonably believed that his particular conduct was lawful. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Abbasi*, 582 U.S. at 152 (quotation marks omitted). To be clearly established, "[i]t is not necessary . . . that the very action in question has previously

been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent." *Id.* (cleaned up). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (alteration in *Eng*). Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his conduct was unconstitutional. *Hope*, 536 U.S. at 741; *see also Saucier*, 533 U.S. at 202 (noting that the law need not be a "precise formulation of the standard" as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & County of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc)). Courts must avoid the "danger of a rigid, overreliance on factual similarity." *Hope*, 536 U.S. at 742-43 (concluding that reasonable officers received fair warning from the "reasoning" of a case "though not the holding," even though "the facts of the case are not identical").

In the Ninth Circuit, a court first looks to binding precedent from the Supreme Court or the Ninth Circuit. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). After that, "in the absence of binding precedent, [courts] look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation marks omitted). Further, a plaintiff bears the burden to show that a right was clearly established at the time of the alleged violation.

*See Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). When considering whether qualified immunity applies, however, a court must resolve all factual disputes in favor of the party asserting the injury. *Ellins*, 710 F.3d at 1064.

As explained above, the Court finds that the FAC fails to state a claim against Officer Smiley and therefore dismisses the FAC with respect to him. The Court also has found, as explained above, that the FAC adequately alleges that Officers Leloff, O'Dea, and Kemp engaged in conduct that was "clearly established" to be unlawful as of 1994. *See Devereaux*, 263 F.3d at 1074-75 (holding that, at least as of 1994, there was "a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government"); *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1219 (9th Cir. 2015) ("The law in 1984 clearly established that police officers were bound to disclose material, exculpatory evidence."); *Youngblood*, 488 U.S. at 57-58 (explaining that the bad faith failure to preserve potentially exculpatory evidence violates the Due Process Clause); *Ciria*, 178 F.4th at 518 ("Malicious prosecution claims based on a violation of a constitutional right were actionable under § 1983 in 1990, as they are now."). Therefore, these Defendants are not entitled to qualified immunity.

### M. *Monell* Liability Against the City

Although a municipality or other local government is a "person" who may be sued under § 1983, *Duarte v. City of Stockton*, 60 F.4th 566, 573 (9th Cir. 2023), it may not be held liable "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, § 1983 does not allow recovery for the actions of a local government's employees under a theory of *respondeat superior* liability. *Id.* at 691. Instead, a plaintiff must show that a municipality had a "policy" that was the "moving force" behind a

violation of the plaintiff's constitutional rights. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (cleaned up). A plaintiff can show a "policy," as that term is used for *Monell* liability, "in one of three ways." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022).

> First, the [municipality] may be held liable if it acted pursuant to an expressly adopted official policy. Second, the [municipality] may be held liable based on a longstanding practice or custom. Third, the [municipality] may be held liable if the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id.* (quotation marks and citations omitted); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); *Gordon v. Cnty of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021) (describing the three ways "[a] plaintiff can satisfy *Monell's* policy requirement").

Plaintiff argues that his *Monell* claim against the City is sufficient based on four independent and alternative theories: (1) a "policy and practice" theory (2) a "failure to train or discipline" theory; (3) a "failure to implement policies" theory; and (4) a "final policymaker" theory. The Court finds that the FAC fails plausibly to establish *Monell* liability under any of Plaintiff's first three theories. The FAC's sparse allegations related to each theory are general, conclusory, and unsupported by specific factual allegations. *See, e.g.*, FAC ¶ 94 (alleging that the City was on notice of "widespread practices . . . under which individuals suspected of criminal activity . . . were routinely deprived of exculpatory evidence, were subjected to criminal

proceedings based on false evidence, and were deprived of their liberty without probable cause"); *id.* ¶ 95 (alleging that the City failed to "adequately train, supervise, and discipline their officers . . . who withheld material evidence, fabricated false evidence, and pursued wrongful prosecutions and convictions"); *id.* ¶ 96 (alleging that the City was aware of the need for adequate policies to govern the disclosure of evidence and questioning of witnesses, yet "made a deliberate choice not to adopt adequate policies, training, or supervision" in these areas). The FAC's failure to allege facts suggesting that the unlawful practices carried out against Plaintiff have occurred in other instances means that the FAC has not plausibly shown that any practice is "widespread" or that any failure to train or failure to implement policies constitutes "deliberate indifference." *See Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) ("A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee."); *Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.").

For Plaintiff's "final policymaker" theory, however, the Court agrees that the FAC adequately alleges that Chief Moose—as Chief of the Portland Police Bureau—was a "final policymaker" for *Monell* purposes. Therefore, the City can be held liable for any constitutional torts Chief Moose committed or directed. As discussed previously, however, the FAC's allegation that Chief Moose "approved of and ratified" the other Defendants' conduct is conclusory. Absent additional allegations suggesting that Chief Moose specifically approved or even was aware of the conduct of the other officers, the City cannot be held liable for the actions of officers other than Chief Moose. Thus, the Court grants, with leave to replead, Defendants'

motion to dismiss Plaintiff's *Monell* claims, except to the extent that they are based on Chief Moose's conduct.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Defendants' motions to dismiss, as stated in this Opinion and Order. ECF 36 and 67. If Plaintiff believes that he can cure the deficiencies identified, Plaintiff may file a Second Amended Complaint not later than December 3, 2026.

**IT IS SO ORDERED.**

DATED this 13th day of November, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge